came within ten inches of the wires they would literally be struck by lightning.

By post-argument brief, appellant, responding to inquiries from the bench, seeks to point out the strongest testimony dealing with this subject by quoting testimony of one Colvin, a pipefitter foreman and an employee of Parsons. After testifying that he was aware of the danger if anyone should come into contact or in close proximity to the wires he was asked specifically: "Have you had any training in the arcing of electricity?" In response to this answer: "No, sir, I haven't," the following question and answer occurred:

"Q. Wasn't it reported to you that this electricity on this occasion arced out and got Mansfield?

A. I was concerned about this, therefore, I went to the Gulf States Utilities prior to the accident and asked these people about the arcing of the electricity . . .."

At this point, the witness was interrupted by counsel and nothing further was stated as to any knowledge he may have gained as to the principle of arcing or the distance which an arc would jump or the like.

Far from showing that the Parsons employees knew of the principle of the electric arc, this question and answer showed that Colvin did not know. It would be strange indeed if this testimony could be utilized to show that through this witness Parsons had "full knowledge" of the "specific danger" which we conclude is required to apply the *Delhi-Taylor* defense.

We have carefully considered the other points raised by appellant and consider them to be without merit.

The judgment is AFFIRMED.

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Eligio Fermin RIVERO,**
**Defendant-Appellant.**

**No. 75–1577.**

United States Court of Appeals,
Fifth Circuit.

May 28, 1976.

Rehearing Denied July 20, 1976.

Nicholas J. Capuano, Richard M. Gale, Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Samuel A. Alter, Jr., Asst. U. S. Atty., Miami, Fla., Samuel Sheres, Narcotics and Dangerous Drugs Section, Crim. Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before BROWN, Chief Judge, GOLDBERG and RONEY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Rivero's appeal from his conviction of attempting to distribute approximately 11 kilos—nearly 22 pounds—of cocaine[1] (Count I) and the dependent but distinguishable crime of unlawfully carrying a firearm during the commission of a federal felony (Count II)[2] turns to a great extent on the admissibility of evidence of a relatively miniscule 2 grams of cocaine, one of the precise crimes charged in an earlier indictment which was dismissed with prejudice[3] by the Government prior to the return of the indictment in the case now before us.

Rivero attacks these convictions[4] on the grounds of (a) insufficient evidence to es-

---

1. *21 § 846*

   *§ 846. Attempt and conspiracy*

   Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

   Pub.L. 91–513, Title II, § 406, Oct. 27, 1970, 84 Stat. 1265.

   This in turn brought in the substantive offense:

   *21 § 841*

   *§ 841. Prohibited acts A—Unlawful acts*

   (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

   (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

   (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

2. *18 § 924*

   (c) Whoever—

   (1) uses a firearm to commit any felony for which he may be prosecuted in a court of the United States, or

   (2) carries a firearm unlawfully during the commission of any felony for which he may be prosecuted in a court of the United States.

   shall, in addition to the punishment provided for the commission of such felony, be sentenced to a term of imprisonment for not less than one year nor more than ten years. In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to a term of imprisonment for not less than two nor more than twenty-five years and, notwithstanding any other provision of law, the court shall not suspend the

   sentence in the case of a second or subsequent conviction of such person or give him a probationary sentence, nor shall the term of imprisonment imposed under this subsection run concurrently with any term of imprisonment imposed for the commission of such felony.

3. Although the Trial Judge in the instant indictment (No. 74–639–CR–CA) and all counsel labored under the misapprehension that the earlier indictment (74–348–CR–PF) returned June 6, 1974 had been dismissed on motion of the Government under F.R.Crim.P. 48(a) "without prejudice" this Court as a result of inquiry on argument has been informed, and accepts, that Judge Fay on June 19, 1975 amended his order of dismissal to state that it was dismissed with prejudice. The initial dismissal was on Sept. 24, 1974, the same date that two co-defendants, Perez and Zamora each pleaded guilty to Count VII of the earlier indictment.

   The dismissed indictment (74–348–CR–PF) in Count I charged Rivero, Perez and Zamora with conspiracy to violate 21 U.S.C.A. § 841(a)(1) and 18 U.S.C.A. § 2 to distribute quantities of cocaine. Of the four overt acts only (4) directly implicated Rivero by charging that "on or about May 23, 1974, Jose Marin of the Drug Enforcement Administration met with . . . Rivero . . .." Counts II, III, IV, V, VI, and VII were substantive charges against Perez, Zamora or either one or both of them, but not Rivero.

   Of special significance, Count VIII charged Rivero with the substantive offense of possession with intent to distribute approximately two grams of cocaine and Count IX charged him with having on May 23, 1974 distributed approximately two grams of cocaine, 21 U.S. C.A. § 841(a)(1) and 18 U.S.C.A. § 2.

4. As the sentences were to run consecutively the concurrent sentence doctrine does not ap-

tablish attempt rather than mere preparation, (b) the use of testimony concerning the two grams of cocaine in view of (i) failure of the Government to obtain leave to amend the bill of particulars, (ii) the dismissal with prejudice of the earlier two gram indictment, and (iii) the refusal of the Trial Court to allow evidence of such dismissal, (c) insufficiency of the evidence on the firearm charge that carrying the conceded weapon was unlawful and, finally, (d) the Court's refusal to require the Government to produce the grand jury testimony of undercover agent Marin given in the earlier dismissed indictment.

We reject (a), (b), (c) and conditionally affirm the convictions subject to further findings and determination by the Trial Court as to (d), the grand jury testimony of Marin.

### What Happened

As the mere preparation-attempt problem inescapably depends on the particular facts, we detail them through *Glasser*[5] glasses largely as stated in the Government's brief. From that point of view Rivero cannot seriously contradict them except, of course, as to the testimony of Rivero himself which, admitting many of the physical facts of meetings, etc. was exculpatory in motive and action.

The facts began to unfold on April 24, 1974 when Defendant Rivero was introduced to a paid government informer, Ms. Sara Cook, by a man named Zamora. On previous occasions Sara Cook, while acting as an informer, had purchased drugs from Zamora.

About a month later, on May 22, 1974, Rivero visited Sara Cook in her apartment and they discussed possible future narcotics transactions. Later that same afternoon Rivero called Sara Cook and told her he had to see her about something very important.

At about 10:00 p. m. that night Sara Cook met Rivero at his apartment and he asked her if she could find her friend Jose [Agent Jose Marin], because Rivero's friend had received a shipment of cocaine and wanted to sell it. Rivero told Cook that other people were also looking for Marin for the purpose of selling the cocaine to him. Cook reassured Rivero that Marin would not deal with others and that she had already spoken to him about this matter. Rivero stated that his unidentified partner would sell the cocaine to him at $13,000 per kilo and that they could then sell it to Marin for $20,000 per kilo. Rivero and Cook set up a meeting for the next morning.

The next morning, May 23, 1974 Rivero came to Cook's apartment and asked if she had spoken to Marin. She told him that she had and Marin would be over in a few minutes. Rivero then took a sample of cocaine rolled in a one dollar bill, sampled it and then placed it in a kitchen drawer.

Agent Marin arrived at the apartment approximately two hours later and was introduced to Rivero by Cook. With Cook present Rivero showed Marin the kitchen drawer which contained the cocaine sample. Agent Marin then ran a field test by burning some cocaine in a piece of aluminum foil and stated to Rivero that the cocaine was of good quality and that they could do business. Rivero wanted money "up front" so Rivero and Agent Marin began negotiations. Rivero further stated that his partner would not distribute the full 11 kilos but only in three or four kilo lots, because he was afraid of a rip-off or of dealing with federal agents.

Rivero then called his partner and told him to wait for him because the business would be completed in one hour so Marin and Rivero continued to bargain over the price of the cocaine, with Marin demanding a lower price and Rivero countering that he

ply. See, *Benton v. St. of Maryland*, 1969, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707; *United States v. Del Toro*, 5 Cir., 1970, 426 F.2d 181; cf. *United States v. Cawley*, 5 Cir., 1973, 481 F.2d 702; cf. *United States v. Strickland*, 5 Cir., 1975, 509 F.2d 273; cf. *Lott v. United States*, 5 Cir., 1962, 309 F.2d 115; *United States v. Barsaloux*, 5 Cir., 1970, 419 F.2d 1299.

5. *Glasser v. United States*, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.

could not sell it at less than $19,000 per kilo, a total of $209,000. Marin replied that he only had $200,000 and Rivero then agreed to accept the $200,000. Marin refused to pay Rivero $50,000 in advance because, so he stated, he did not know who Rivero was or where he lived. Rivero, as security for the "up front" money he was requesting, then offered the key to his apartment, where he had $50,000. Marin still demanded to see the cocaine before paying any money.

Thereafter they reached an agreement by which Rivero would take Marin to the source's house, Rivero would go inside the house and bring back a certain amount of cocaine. Once Marin had seen it he could give Rivero the money and Rivero could go back in and pay for the drugs. Rivero then made a phone call and advised the person on the other end to get everything ready because the deal would take place in approximately 45 minutes. After agreeing to meet later at Rivero's grocery store Marin and Rivero then left Cook's apartment about 11:30 a. m.

Marin met Rivero about 1:00 p. m. at Rivero's grocery store. While there Marin saw Rivero speaking with two individuals, Zamora and Bernado Linares. One of the men carried a shopping bag and the other carried a see-through bag that contained a small box. After his conversation with the two men Rivero returned to talk to Marin. At this time he again demanded money in advance but this time he only asked for $15,000. Rivero told Marin that he had about $40,000 in jewelry that he would put up as collateral and that when given the $15,000 advance money he would return with the cocaine to be paid the balance, and retrieve his jewelry. Marin refused and when Rivero told him that his partner suggested he make this offer Marin suggested he give the jewelry to Rivero's partner as collateral. Rivero said he would ask, left the parking lot where the two had been conversing and went back into the grocery store for approximately five minutes.

When Rivero returned he was carrying a large paper bag and again argued for about 20 minutes about advance money. Rivero asserted he had shown a lot of faith in bringing Marin to his business and did not understand why Marin would not advance the $15,000. Marin told Rivero he was not interested in jewelry and would pay the cash only when he saw the cocaine. Rivero then asked Marin to drive him downtown to a bank where he had a friend who would give Rivero $15,000 for his jewelry so that he could then consummate the deal with Marin.

They left shortly in Marin's car. On the trip Rivero said he would give Marin directions and soon thereafter Rivero opened a box similar to the one Marin earlier saw Zamora carrying. Rivero showed Marin several pieces of jewelry and again said he would be willing to give all of this in exchange for $15,000 and could not understand why Marin was not willing to do business in this manner.

With Agent Marin driving, the automobile proceeded south toward the Dade County metropolitan area and was pulled over by a battery of surveillance officers. During the execution of the arrest Rivero pulled a loaded Detective Special .38 caliber Colt revolver from his waistband and aimed it at the arresting officers.

*Preparation Versus Attempt*

With Judge Rives' extended scholarly opinion for the Court in *Mandujano*[6] which canvassed the law from ancient to modern times, including the proposed Model Penal Code, the proposed definitions of the National Commission on Reform of Federal Criminal Laws and contemporary tests adopted by a number of the states, it would be an affectation for us to restate or attempt to distill the law's acceptable quest for an easy-to-apply verbal articulation of the elusive term "attempt" as used in this and other statutes. To *Mandujano* should also be added *Oviedo*.[7] Without adding to, distinguishing or diluting in the slightest

---

6. *United States v. Mandujano,* 5 Cir., 1974, 499 F.2d 370.

7. *United States v. Oviedo,* 5 Cir., 1976, 525 F.2d 881.

degree what these cases hold and say, the key to this case is found in the almost black-letter of *Mandujano.*

First, the defendant must have been acting with the kind of culpability otherwise required for the commission of the crime which he is charged with attempting. . . .

Second, the defendant must have engaged in conduct which constitutes a substantial step toward commission of the crime. A substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent.[8]
499 F.2d 370, 376.

The facts as recited in detail meet every conceivable test in the potpourri of *Mandujano* with *Oviedo's* requirement that "the objective acts performed, without any reliance on the accompanying *mens rea,* mark[ed], the defendant's conduct as criminal in nature." And credited as they were by the jury's verdict, the facts more than ever fit *Oviedo's* demand that the acts ". . . should be unique rather than so commonplace that they are engaged in by persons not in violation of the law."

In the light of the detailed facts showing, on the Government's case, that Rivero was pegged time and time again with acts looking toward the sale of about 11 kilos of cocaine at a price that would net him a tidy $60,000 in profit for a day's work only a reprise is necessary to bring this to a final curtain call.

Rivero sought out a quick meeting with Cook to find a buyer for the large quantity available for purchase by him. On the very next day he engaged in extended negotiations with Marin and went so far in that activity that he called his partner to complete arrangements for the payment and delivery of the 11 kilos of cocaine. To prove his good faith and the fact that, unlike *Oviedo,* he was dealing in what was in fact cocaine, Rivero gave Marin a sample of the cocaine. Rivero met with Marin at his store at which time he again demanded "front money" prior to delivery. To prove his good faith and reliability, in light of Marin's apprehension that payment of the reduced $15,000 would be unfruitful, he offered to put up $40,000 worth of jewelry as collateral. Failing in this he attempted to get his unidentified partners to accept his jewelry as collateral for the delivery of the cocaine to Rivero for sale to Marin. Failing in all of this Rivero then asked Marin to take him to a bank where he could borrow money using his jewelry as collateral. Finally to carry out this step in the closing of the hoped-for purchase and sale Rivero directed Marin to the bank and on the trip displayed the jewelry which, by this time, by Rivero's own words and deeds had become, not just a step, but following many, many steps, the last step toward completion of this Miami Connection.

### A Little Bit Of Bill Of Particulars
### A Little Bit Of Res Judicata
### A Little Bit Of Double Jeopardy

By every conceivable legitimate means known to these competent advocates for Rivero, by in effect seeking an order *in limine,* a so-called motion to suppress, by objections to the testimony when offered and received and by a careful record-making that reflects great credit on their respectful advocacy, the defense protested vigorously against the Trial Court's allowing evidence by Cook and Marin of the two gram sample of cocaine given by Rivero to Marin which had been placed by Rivero in the kitchen drawer. These objections went also to the proof by the DEA forensic chemist identifying the sample as 47.7% pure cocaine.

■ The Judge overruling all of these objections admitted it for the limited purpose of bearing upon intent.[9] Apart from the complaints which we now discuss, this incident was proved to a sufficient certain-

---

8. The charge given to the jury by the Trial Judge on attempt-preparation was the same charge we approved in *Mandujano,* note 6, *supra.*

9. The cautious Trial Judge, the first time any of this evidence was allowed in, carefully instructed the jury.

ty, *United States v. Broadway,* 5 Cir., 1973, 477 F.2d 991; *United States v. San Martin,* 5 Cir., 1974, 505 F.2d 918; *United States v. Cavallino,* 5 Cir., 1974, 498 F.2d 1200. This was not only sufficiently related in time but constituted a part of the very transaction under scrutiny so that it was clearly admissible.[10]

The first attack is that this amounted to an unauthorized variation, if not a contradiction, of the bill of particulars, the pretrial conferences between counsel and the responses by the Government under the Standing Discovery Order of the District Court. Rivero's motion for bill of particulars filed on Dec. 16, 1974 sought detailed information as to the time and place of distribution of the cocaine and possession of it by Rivero.[11] The Government's bill of particulars filed Jan. 7, 1975 stated very positively (6) "there was no physical distribution of narcotics to Agent Jose Marin, by the defendant" and (10) the "defendant did not have actual physical possession of the 11 kilos of cocaine on May 23, 1974."

> THE COURT: Ladies and gentlemen, evidence has been introduced regarding the alleged delivery of a cocaine sample from the defendant Rivero to Mr. Marin and I instruct you that this evidence is not admitted in evidence to prove the alleged offense set forth in the indictment but it is admitted solely for your consideration of whether it tends to show that he intended to commit the offense with which he is charged. In other words, it is there only to show if you do find beyond a reasonable doubt that he did commit the offense charged in the indictment that there was intent to commit such an offense. I make that announcement now.
> \*   \*   \*   \*   \*   \*
> THE COURT: \* \* \* In other words, ladies and gentlemen, I am submitting to you it is not proof of the offense itself but only if you find beyond a reasonable doubt the offense charged in the indictment. \* \* \*

We need not decide whether the law compelled the Trial Court to so limit this evidence. But since it was so limited we have not regarded it as one of the "substantial" steps of the second part of the *Mandujano* formula, see note 6, *supra* and related text. On this record the steps were substantial without reference to the two grams.

**10.** Eliminating the problem the Court wrestled with in *Oviedo,* that it was in fact cocaine, not

Within two days, on January 9, although apparently not received by counsel until January 13, the Government advised counsel that, contrary to the initial plan for the trial, the Government now intended to offer a chemist's report on the analysis of the cocaine delivered to Marin by Rivero.[12] As the informal letter advice spoke in terms of "cocaine delivered to Mr. Marin" this was, without refined regard to semantics inconsistent with the categorical reply (6) "there was no physical distribution of narcotics to . . . Marin." The trial, however, did not commence until January 20 and although vigorous protests were made, there was no motion for continuance or, in the almost endless colloquy between Court and defense counsel, any real claim of prejudicial surprise in the sense that this claimed repudiation of the bill of particulars put them in a bind on investigation and preparation.

■ We conclude there are at least two answers to this complaint. In the first

what someone supposed to be cocaine, it was clearly relevant and material.

**11.** The motion for bill of particulars requested:
  6. State whether the alleged distribution occurred inside or outside a building.
  7. State the type of building.
  8. State the name of any residence or owners if the distribution occurred inside a building.
  9. State the names and addresses of the person or persons the Defendant is alleged to have distributed to.
  10. State whether or not the Defendant had actual or constructive possession of the alleged 11 kilos of cocaine on May 23, 1974.

**12.** The letter stated:
  Attached herewith is a copy of the chemist's report which contains the analysis of the cocaine delivered to Agent Jose Marin by the defendant Eligio Fermin Rivero on May 23, 1974.
  The attached chemist's report was not given to you during our conference since I believed then that the exhibit would not be used. However, I intend to use the cocaine delivered to Mr. Marin as an exhibit in the case and the chemist's report is given to you for your information pursuant to the standing discovery order.

place, we would not minimize the significant value of positive statements made in a bill of particulars since it is to inform a defendant of the nature of the charges and to avoid the danger of surprise. *United States v. Martinez,* 5 Cir., 1972, 466 F.2d 679; *United States v. Sullivan,* 5 Cir., 1970, 421 F.2d 676. But although this controls such issues on the trial, see C. Wright *Federal Practice and Procedure* § 129, pp. 291–2, the case is not thereby frozen in concrete as F.R.Crim.P. 7(f) recognizes.[13] Nor is there any precise form in which the Judge has to allow the amendment. Considering the extended presentation of this matter both before the commencement and during the trial, the Court's clear ruling after considered deliberation, and not in any sense a shot from the hip, was the equivalent of allowing the bill of particulars to conform to evidence of a weight permitting the jury to credit it beyond a reasonable doubt. We find no abuse of discretion in either the manner or the result.

In the second place, the record does not reveal any real prejudice. Unlimited cross-examination was permitted of both Cook and Marin as well as the forensic chemist as to the fact of the meeting in Cook's apartment. This was uncontradicted on Rivero's own testimony although, of course, he denied furnishing the sample to Marin or witnessing what went on in the kitchen between Cook and Marin while Rivero, so he stated, remained in another room.

■ The second attack, although not articulated in such terms, and as best as we can divine it, is akin to something resembling double jeopardy or res judicata or its half sister, collateral estoppel. See *Sealfon v. United States,* 1948, 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180.

Considering that there never was a trial, or so far as this record reveals, any significant proceedings of any kind following the indictment in the earlier two gram case save for the order of dismissal,[14] the defendant was never put in jeopardy, see, *Serfass v. United States,* 1975, 420 U.S. 377, 95 S.Ct. 1055, 43 L.Ed.2d 265; *United States v. Jenkins,* 1975, 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250. Principles of double jeopardy did not prohibit the Government from proving facts, indeed even proving facts which might have been proved under the dismissed indictment. Nor, considering the fact that whether to initiate prosecution, *United States v. Cox,* 5 Cir., 1965, en banc, 342 F.2d 167, is committed to the sole discretion of the Executive and the Court's role is an extremely narrow role in dismissals of indictment under F.R. Crim.P. 48(a) on motion of the Government, *United States v. Cowan,* 5 Cir., 1975, 524 F.2d 504, the dismissal of the indictment, with or without prejudice, does not amount to the determination of any of the intrinsic underlying facts. What, and all, it stands for, is that the defendant cannot be reindicted or tried for that same charge. Consequently, we find any claim based on the theory of res judicata-collateral estoppel to be equally unfounded. The simple fact is that the dismissal of the previous indictment under these circumstances does not insulate the facts from further exploration and use.

■ Finally, and as a sort of an amalgam of all of these protestations, Rivero asserts that since the incident of Rivero furnishing Marin the two grams on May 23, 1974 was at the heart of the earlier indictment, and became important on the trial of the 11 kilos charge he ought to have been able to inform the jury by appropriate means that the indictment had been dismissed. Of course any such contention is to read into the act of dismissal a determination that the facts could not have supported a conviction. Considering, however, the almost un-

---

13. Rule 7, Rules of Criminal Procedure.

 (f) Bill of Particulars. The court may direct the filing of a bill of particulars. A motion for a bill of particulars may be made before arraignment or within ten days after arraignment or at such later time as the court may permit. A bill of particulars may be amended at any time subject to such conditions as justice requires.

 As amended Feb. 28, 1966, eff. July 1, 1966; Apr. 24, 1972, eff. Oct. 1, 1972.

14. See note, 3, *supra.*

limited discretion of the Executive in the initiation and continuation of prosecutions, this would be a thin basis for a jury to conclude that the real reason was that there was insufficient proof to implicate the then defendant since, if it were opened up at all, the Government would be entitled to demonstrate, from its standpoint, the real reasons for the dismissal. This would have, as the Government urged and the Court embraced, sent the whole case far afield in which the myriad factors open to prosecutorial discretion would be examined thereby subjecting the Executive, not to the informed judgment of Judges, but the untutored reaction of a jury. The upshot would be that *Cox* and *Cowan* would be binding on the Court but not on the jury.

We find none of the arguments, whether discussed specifically by us, persuasive and we reject the claim. Whatever error that might be thought to have crept in, was harmless beyond a reasonable doubt.

### The Firearms Case

■ The complaint here is a straightforward one that there was insufficient evidence to establish the essential ingredient that Rivero's carrying of the firearm was "unlawful". (See note 2, *supra*). There was no problem that the gun was a firearm, since this and its ownership by Rivero were stipulated. The question turns on whether it was "unlawful" for him to be carrying it stuck in his waistband prior to the time he withdrew it and brandished it at one or more officers.

On this the Government offered two Florida state officers. The principal witness was Lieutenant Ansley of the Public Safety Department. His testimony, object-

ed to because "immaterial" and not, except for one or two questions on the ground that his answers expressed an opinion on law, was that he was familiar with the laws of Florida and Dade County and the ordinances concerning the carrying of concealed weapons and firearms. Under the statutory structure the state of Florida and Dade County a formal permit is required in order to carry a firearm and none, on the examination of public records, was ever issued to Rivero. On cross examination, after the Court had overruled the only basic objection—immateriality—the witness testified that it would be unlawful under the appropriate ordinances for a person without a permit to carry a pistol stuck in his waistband as had Rivero even in an automobile.

Whatever misgivings we might have to this method of proof which adds only to the problems of Trial Judges and appellate courts and defeats the public-needed goal of finality in criminal cases, we find that there was sufficient evidence to establish that the carrying of the weapon in this fashion was "unlawful". After all, this question of "fact" was essentially a question of law on which the Court could, and ordinarily would, take judicial notice.[15] The law is a fact and the Court is presumed to know the law or find it. While the Court of Appeals is not required to notice matters not brought to the attention of the Trial Court, it may do so for the purpose of affirming or showing the impropriety of a decision below. *American Legion Post No. 90 v. First National Bank and Trust Company*, 2 Cir., 1940, 113 F.2d 868; see *Glapion v. M/S Journalist*, 5 Cir., 1973, 487 F.2d 1252.

Here the Judge's undisclosed prescience turns out to be wellfounded, for in response

---

**15.** Rivero's brief states that the defendant "concedes that a federal judge may judicially notice the law of every state, and may inform himself or herself in any manner that he or she chooses, regardless of whether the statute is formally called to the Judge's attention, *United States v. Romano*, 5 Cir., 1973, 482 F.2d 1183, 1191.

ARTICLE II. JUDICIAL NOTICE
Rule 201.
JUDICIAL NOTICE OF ADJUDI-
CATIVE FACTS

\* \* \* \* \* \*

(f) Time of taking notice. Judicial notice may be taken at any stage of the proceeding.

(g) Instructing jury. In a civil action or proceeding, the court shall instruct the jury to accept as conclusive any fact judicially noticed. In a criminal case, the court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed.

to penetrating questions on argument the parties do not now question that § 790.05–06 makes it an offense to carry "any pistol, winchester rifle or other repeating rifle" without having obtained a license from the county commissioners.[16] This statute is self-executing and condemns the carrying of any such weapon *unless* a permit is issued. Pursuant to this statutory authority the county commissioners of Dade County enacted the ordinance, § 21–15 [17] which prescribes the requirement for and the means of obtaining a permit "for the carrying of concealed weapons" as done by Rivero while riding with Agent Marin.

This fact and fact-law question of "unlawful" was amply substantiated since this statute, 18 U.S.C.A. § 924, note 2, *supra*, encompasses any situation in which the carrying of a firearm violates federal, state or municipal law of the area involved. We fully approve the definition of *United States v. Ramirez*, 2 Cir., 1973, 482 F.2d 807;

*United States v. Howard*, 8 Cir., 1974, 504 F.2d 1281. The charge, to the jury,[18] while perhaps more sketchy than ordinarily desired, was adequate, at least over the objection leveled at it.

The conviction on the firearm count is sustained.[19]

### The Jencks Act

### *Marin's Earlier Grand Jury Testimony*

■ Again with a zealous regard for preserving the record, Rivero's counsel repeatedly demanded the production of Marin's testimony before the grand jury returning the earlier two gram indictment (see note 3, *supra*). The request was based upon a simple and straightforward theory. Since the trial of the instant case presented as a critical item the furnishing of the two grams of cocaine by Rivero to Marin in Cook's kitchen and this was the very heart of the earlier indictment charging possession with intent to distribute, Title 21,

16. Florida statutes.
    790.05 Penalty for carrying pistol or repeating rifle without first obtaining license
      Whoever shall carry around with him, or have in his manual possession, in any county in this state, any pistol, Winchester rifle or other repeating rifle, without having a license from the county commissioners of the respective counties of this state shall be guilty of a misdemeanor of the second degree, punishable as provided in § 775.082 or § 775.083; provided, this section shall not apply to sheriffs, deputy sheriffs, city or town marshals, policemen, or United States marshals or their deputies as to the carrying of concealed weapons.
    Amended by Laws 1971, c. 71–136, § 740, eff. Jan. 1, 1972; Laws 1973, c. 73–334, § 32, eff. Aug. 5, 1973.
    790.06 How license procured
    The county commissioners of the respective counties of this state may at any regular or special meeting grant a license to carry a pistol, winchester or other repeating rifle, only to such persons as are over the age of twenty-one years and of good moral character, for a period of two years, upon such person giving a bond payable to the governor of the state in the sum of one hundred dollars, conditioned for the proper and legitimate use of said weapons, with sureties to be approved by the county commissioners. The commissioners shall keep a record of the names of the persons taking out such a license, the name of the maker of the firearm

so licensed to be carried, and the caliber and number of the same.

17. § 21–15 OFFENSES AND MISCELLANEOUS PROVISIONS § 21–16
    Sec. 21–15. Concealed weapons, permit.
    (a) *Director of public safety to issue.* The director of public safety is hereby empowered and directed to issue permits for the *carrying of concealed weapons* upon proof before him that the person applying therefor is over the age of twenty-one years, is of good moral character, and that good cause exists for the issuance thereof. It shall be deemed a good cause for the issuance of such permit if the applicant is engaged in an occupation reasonably requiring such a permit, or that he has good reason to fear an injury to his person or property, or for any other proper purpose. (Emphasis added).

18. The Court charged:
    Unlawfully carrying a firearm means carrying a firearm without the legal right to do so.
    Thus, you must find, beyond a reasonable doubt, that the pistol or revolver, Government Exhibit 4 was carried by the defendant at the time stated in the indictment and that the defendant had no legal right or license to carry said firearm.

19. Being dependent upon the conviction of the commission of the felony narcotics charge, it will, on the remand ordered, stand or fall with the narcotics count.

U.S.C., 841(a)(1) the two grams—the very same two grams of cocaine—this was a matter which, in the words of the Jencks Act related " . . . to the subject matter as to which the witness has testified." [20]

The principal argument advanced by Rivero was that since Rivero's testimony sharply contradicted what went on in Cook's apartment on that occasion and the case pretty well turned upon Marin's credibility on Rivero's furnishing him the sample of the cocaine, which Marin then tested, his credibility was very much in question. There was, therefore, a vital need for his earlier grand jury testimony which dealt with the very same transaction.

To the extent that this was an effort to show a "particularized need to inspect grand jury minutes" apart from the Jencks Act itself, the Trial Court could not be faulted on this record for declining to order the Government to produce it since essentially this is an effort to obtain it for impeachment purposes. *Paz v. United States*, 5 Cir., 1972, 462 F.2d 740, 746–7.

Whether the Trial Judge and counsel were simply unaware of the 1970 amendments is not certain especially since Marin's grand jury testimony on the 11 kilos indictment was promptly furnished. But if all were aware of the 1970 amendments there was nothing in the words exchanged to indicate it and certainly there was not even the slightest mention in any form or language of the critical phrase in § 3500(b) requiring production of any statement "which relates to the subject matter as to which the witness has testified." We have

declared that " . . . the legislative purpose for these amendments . . . is to undergird the truth finding process of criminal trials by making any *existing* prior statements made by a witness used by the government equally available to the defense and prosecution." *United States v. Cruz*, 5 Cir., 1973, 478 F.2d 408.

On appeal, either on brief or argument, the Government does not really face up to this. On the other hand we think Rivero's position is sound, that in the peculiar structure of these two indictments, and the developments on this trial which were regarded as significant and important to the Government's case, the great probability is that, for the grand jury to have brought forth the earlier indictment, Marin must have testified about the two gram incident. That being so it surely related directly and critically to one of the perhaps significant, if not decisive, factual issues to be tried.

But for us to conclude, as we do, that the Court's refusal in response to the the uninformed, unresearched, instinctive response of the Government, violated the Jencks Act does not at all mean that the convictions need to be set aside. Of course the proper course for the Trial Court, had he been more adequately advised by informed counsel, would have been for him to make an *in camera* examination of Marin's grand jury testimony so that he could produce to the defense the portions of that testimony which related to Marin's testimony at Rivero's trial, while excising those portions which did not so relate. See 18 U.S.C. § 3500(c).[21] Since the Judge did not do that

---

20. 18 U.S.C.A. § 3500:

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which *relates to the subject matter as to which the witness has testified.* If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use. (Emphasis supplied).

\* \* \* \* \* \*

(e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

\* \* \* \* \* \*

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury. (Emphasis added).

21. 18 § 3500 CRIMINAL PROCEDURE

§ 3500. Demands for production of statements and reports of witnesses

(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate

we cannot in the face of this clear violation of the amended Jencks Act simply assume that the error was harmless as in *United States v. De Simone*, 5 Cir., 1971, 452 F.2d 554. Indeed, by its very nature, that cannot be demonstrated in the absence of the very document which will reveal whether there is or is not a substantial, inconsistency contradiction or variation.

When it comes to relief several options are open. We could, of course, order the production of Marin's grand jury testimony for an *in camera* inspection by us. But from the natural give and take of any hotly contested trial the Trial Judge is in a much better position than we would be in assaying the practical effect of the nonavailability of this grand jury testimony. As we did in *Paz*, we follow a procedure similar to that outlined by Judge Simpson in *United States v. Barson*, 5 Cir., 1970, 434 F.2d 127, 131.

The Trial Judge should first make an *in camera* inspection of Marin's testimony given before the grand jury which returned the earlier indictment. If, after the *in camera* examination, the Judge concludes that there is an arguable factual basis for concluding that some or all of such grand jury testimony "related to the subject matter as to which the witness . . . testified" at Rivero's trial, the Judge shall make available to all counsel such portions of that grand jury testimony as reasonably related

to the two gram incident in Cook's kitchen and the circumstances leading up to and following it or to any other matter as to which Marin testified on the trial under review. See 18 U.S.C. § 3500(c), note 21, *supra*. Marin testified about other things at the trial. If portions of the grand jury testimony relate to *any* part of the trial testimony it should be given to the defense.[22]

The District Court should thereafter conduct such further adversary hearings as appropriate. On reasonable notice such hearing and inquiry will include a comparison of Marin's testimony with respect to the two gram incident as given for the earlier indictment, any testimony on it in the 11 kilos grand jury proceedings and all of this testimony on Rivero's trial.

Upon this inquiry and hearing the Court shall then determine whether there is or is not a reasonable possibility that the absence of this grand jury testimony affected the outcome of the case or handicapped Rivero or his counsel in their presentation or defense.

If the District Court concludes on such hearing that there is such a possibility then a new trial as to both counts must be granted. If, on the other hand, the Court concludes that there is no reasonable possibility that it affected the outcome of the case or otherwise significantly prejudiced Rivero the convictions will stand affirmed.[23]

to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a

defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

**22.** Unless it fairly relates to Marin's testimony at Rivero's trial this would not include Marin's testimony relating to Counts II, III, IV, V, VI, VII of the earlier indictment, see note 3, *supra*.

**23.** This Court declares as the law of this case that an appeal will lie to this Court from any decision of the District Court on remand adverse to Rivero.

We have today decided the other issues raised by Rivero because we would be required to do so even if we were ultimately to order a new trial on the Jencks Act point. If, for ex-

**462**

AFFIRMED BUT REMANDED FOR FURTHER PROCEEDINGS.

ample, we have determined that the evidence was insufficient on either the attempt or the firearm charge, a reversal rather than a remand for a new trial would have been appropriate. Further, the questions we have decided regarding the admissibility of testimony concerning the two gram sample would almost certainly arise in a new trial.