**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James E. BROWN and David R. Scott, Defendants-Appellants.**

No. 78–5345.

United States Court of Appeals, Fifth Circuit.

Oct. 9, 1979.

Rehearing Denied Nov. 15, 1979.

---

William F. Alexander, Kerry P. Fitzgerald, Dallas, Tex., for Brown.

Bill M. Glaspy, Mesquite, Tex., for Scott.

John H. Hannah, Jr., U. S. Atty., Heriberto Medrano, Asst. U. S. Atty., Tyler, Tex., for plaintiff-appellee.

Before TJOFLAT and VANCE, Circuit Judges, and ALLGOOD, District Judge.*

VANCE, Circuit Judge:

This prosecution involves an alleged attempt and conspiracy by James E. Brown and David R. Scott during the summer of 1976 to have their grocery store in Wills Point, Texas, blown up. The events began in May 1976 when Scott sought information about purchasing untraceable explosives to blow up a building. A series of negotiations between Brown and undercover agents of the Bureau of Alcohol, Tobacco and Firearms concerning employment of an explosives expert to blow up the store ensued. The relevant sequence of events terminated on August 26, 1976, when contact between defendants and the undercover agents was broken off. Demolition of the store did not take place.

In December 1975, Brown and Scott borrowed approximately one hundred thousand dollars and purchased the store. They experienced cash flow problems, and their principal supplier put them on a cashier's check paying basis. In the summer of 1977 defendants agreed to sell the store including building, fixtures and merchandise to their store manager for one hundred five thousand dollars. On August 15, 1977, however, before the sale was closed, the store was totally destroyed by a fire that had been intentionally set. The identity of the arsonist has not been established. Scott filed a proof of loss claiming the full insurance coverage of one hundred sixty-five thousand dollars.

After the store was destroyed in the 1977 fire a federal grand jury returned indictments against defendants arising out of the 1976 events. Brown was charged in Count One with violating 18 U.S.C. § 844(i) by attempting to destroy by means of an explosive a building used in interstate commerce. In Count Two both defendants were charged with violating 18 U.S.C. § 371 by conspiring to destroy by means of an explosive a building used in interstate commerce. A jury found defendants guilty as charged.

On appeal they advance two challenges to the sufficiency of the evidence.[1]

---

* District Judge of the Northern District of Alabama, sitting by designation.

1. We also reject Scott's complaint concerning the denial of his request for an instruction that his exculpatory statement must be disproved by the government. Scott relies on *Grady v. State,* 466 S.W.2d 770 (Tex.Cr.App.1971) for the holding that such an instruction is required under Texas state practice. The government concedes the existence of the state rule, but argues that it is subject to applicable exceptions. More importantly it points out that the rule is peculiar to the law of Texas and not binding on this court. *See* Annot., 116 A.L.R. 1460 (1938). Scott cites no precedent in which such an instruction is held to be mandatory by this or any other federal court.

The first is whether the evidence established Brown's guilt of an attempt to blow up the building. The second concerns the sufficiency of the evidence of conspiracy particularly with respect to Scott. Familiar standards govern our review of both questions. We take the view of the evidence most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and we must sustain the denial of a motion for judgment of acquittal if a reasonable jury might decide that the evidence is inconsistent with every reasonable theory of defendants' innocence. *United States v. Fredericks,* 586 F.2d 470, 474 (5th Cir. 1978), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979); *United States v. Warner,* 441 F.2d 821, 825 (5th Cir.), *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971).

## I.

Brown does not contest that he had extensive conversations with A.T.F. undercover agents concerning blowing up the building. In fact he participated in five meetings and four telephone conversations. Many of the conversations were recorded, and the tapes were in evidence. Brown contends that this was nothing more than mere preparation and that preparation is not an attempt.

The meetings between Brown and A.T.F. agent Wernette began in Canton, Texas, on July 20, 1976, some two months after Scott first inquired about untraceable explosives. In an early meeting Brown asked the agent whether he had access to explosives and a man to use them. A few days later the agent told Brown he could get a man. Brown said he was willing to pay $5,000 and was interested in talking about it real soon.

At their next meeting ten days later in Dallas, Wernette told Brown that his man was interested. Brown described the building to be destroyed and told the agent it was at Wills Point, Texas. He told Wernette that it would have to be done at a certain time and that it was going to be an insurance deal. He mentioned an additional $25,000 in insurance. Brown told the agent the method he would use in blowing up the building, but said having someone else do it was worth $5,000 because it was so close to home.

On August 11, 1976, Brown told Wernette that he would like the explosives man to look at the building. He volunteered to show Wernette and the expert around the store, but said that in any case his partner would be at the store any time before 7:30 and that he would know more about exact dimensions. Two days later Wernette introduced Brown to a second undercover agent, Bowers, who pretended to be the explosives man. Brown said the job should run around $5,000 and for that amount he would want the building flat level to the ground. They discussed structural details, the amount of explosives needed, the time frame and the escape route to be used in leaving the building. Brown wanted the job done on a Saturday because it would be more profitable. Brown discussed procurement of the explosives with Bowers and agreed that if Bowers could come up with the explosives he would reimburse him. The two agents left to inspect the building. Brown had told Bowers that Wernette knew who to see when they arrived at the store. They went to the store and were shown around by Scott.

Three days later Brown and Wernette had a telephone conversation in which Wernette said that Bowers was willing to go ahead but that he still wanted something, referring to an advance of money for expenses. Brown said he thought that they were in agreement and confirmed that Bowers would be reimbursed for expenses in acquiring the explosives.

The last contact between the agents and Scott was on August 23, 1976. After that meeting no relevant events took place. No explosion occurred, and no money ever changed hands.

The question squarely presented by Brown on appeal is whether his conduct was sufficient to constitute an attempt or

whether, as he contends, it was mere preparation. The problem of distinguishing preparation from an attempt under varying facts has caused recurring difficulty. The principles on which our resolution of the present problem will be based are found in *United States v. Mandujano,* 499 F.2d 370 (5th Cir. 1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975), as refined by *United States v. Oviedo,* 525 F.2d 881 (5th Cir. 1976) and *United States v. Rivero,* 532 F.2d 450 (5th Cir. 1976). *Rivero* distills from Judge Rives' opinion in *Mandujano* the following formulation:

> First, the defendant must have been acting with the kind of culpability otherwise required for the commission of the crime which he is charged with attempting.
> . . .
> Second, the defendant must have engaged in conduct which constitutes a substantial step toward commission of the crime. A substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent.

532 F.2d at 455 (quoting 499 F.2d at 376) *Oviedo* emphasizes the requirement that

> the objective acts performed, without any reliance on the accompanying *mens rea,* mark[ed] the defendant's conduct as criminal in nature.

525 F.2d at 885.

Brown's conduct clearly met the first of the stated *Mandujano* tests. Our consideration at this point focuses on the second. Did Brown's conduct include the taking of such a substantial step that it crossed the line from mere preparation? Did it strongly corroborate the firmness of his criminal intent and make his conduct criminal in nature? We conclude that it did in each of two particulars.

In *Mandujano* the court used the American Law Institute's Model Penal Code in its analysis and quoted from it at some length. 499 F.2d at 377 n. 6. Immediately subsequent to quoted portions the Code also contains the following:

> Without negativing the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal pur-

pose, shall not be held insufficient as a matter of law:

> . . . . .
>
> (c) reconnoitering the place contemplated for the commission of the crime.
>
> . . . . .
>
> (f) . . . collection . . . of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such . . . collection . . serves no lawful purpose of the actor under the circumstances . . . .

Model Penal Code § 5.01 (Proposed Official Draft 1962).

Viewed as we must view it on appeal, the evidence shows that Brown (1) made a firm agreement with Bowers for acquisition of the explosives needed to blow up the store and (2) dispatched Wernette and Bowers to reconnoiter and inspect the building in preparation for its destruction. In both instances he engaged in conduct that met the second *Mandujano* test. We, therefore, conclude that the evidence was sufficient to support the jury's finding that he was guilty of an attempt.

## II.

Scott correctly contends that, wholly aside from Brown's attempt, his guilt depends on proof that a conspiracy existed, that he knew about it and that he voluntarily joined it. He points out that suspicion is not enough and that his guilt will not be inferred from mere association with Brown.

Although the evidence may be circumstantial, it must prove Scott's guilt beyond a reasonable doubt. Scott concedes in brief that, if existence of a conspiracy were shown, evidence of his connection might be slight. After the filing of Scott's brief, however, this court sitting *en banc* repudiated the so-called slight evidence rule. *United States v. Malatesta,* 590 F.2d 1379 (5th Cir.), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979). Even prior to *Malatesta,* the government could derive no benefit from the slight evidence

rule since Scott's connection was necessary to the very existence of the two-man conspiracy. That connection must have been proved beyond a reasonable doubt for the conviction of either defendant under Count Two to stand.

The evidence against Scott began with his inquiries about untraceable dynamite for use in blowing up a place about the size of a building at Brown's father's place of business. Immediately before the inquiry he was seen with Brown. Scott was Brown's partner in a grocery enterprise that the jury could have concluded was in financial difficulty. Scott handled the insurance for the partnership and placed enough coverage on the store so that the amount of the insurance exceeded by sixty thousand dollars the amount for which they later agreed to sell the business. Scott accompanied Brown to the August 3, 1976, meeting with undercover agent Wernette, who was accompanied by agent Doris Jefferies. When Brown and Wernette went outside for their discussion, Scott told Doris Jefferies that he was in the grocery business but would not be for long. She asked Scott why Brown and Wernette went outside, and Scott replied that they had a big deal going.

Finally, when Wernette and Bowers were sent by Brown to the store to inspect the building, they were met by Scott who stated that he had been expecting them. There was no discussion about blowing it up, but the tour of the store conducted by Scott included the structural features of the building, the location of the back door, and things that Brown and the agents had discussed as things that the bomber would need to know.

Scott relies heavily on his meeting with the agents on August 23, 1976, when they showed him what they described as explosives. Scott denied any interest in them. Wernette asked Scott why he had shown the agents around the store. Laughing, Scott remarked that he thought they might like to see it. Before this court Scott argues that the conversation contained exculpatory statements. Because the conversation was recorded both the jury and this court have heard it. From the conversation's content, Scott's tone of voice and his inflection the jury may well have determined as we do that, aside from the naked words, Scott's statement did not convey an impression of innocence.[2]

We conclude as this court did in *Rodriguez v. United States*, 373 F.2d 17, 18 (5th Cir. 1967), that, although Scott may have exercised circumspection and restraint in dealing with the A.T.F. agents, the evidence demonstrates a great deal more than mere association with Brown. Entirely disregarding Brown's declarations that linked Scott to the alleged conspiracy, there was ample independent evidence from which a jury could exclude every reasonable hypothesis other than Scott's active, knowledgeable participation as part and parcel of his partner's scheme.

AFFIRMED.

---

**2.** The jury may have concluded that Scott's manner of speaking, inflection and tone of voice were incompatible with the literal meaning of the words used and, indeed, conveyed the opposite meaning. Weinstein says of Federal Rule of Evidence 801(d)(2), "The rule makes no attempt to categorize the myriad ways in which a party . . . may make an admission. Admissions can be made expressly or may be inferred from conduct." 4 Weinstein's Evidence ¶ 801(d)(2)(A)[01] at 801–118 (1978). Among the supporting authorities cited is our opinion in *United States v. Nakaladski*, 481 F.2d 289, 300–301 (5th Cir.), *cert. denied*, 414 U.S. 1064, 94 S.Ct. 570, 38 L.Ed.2d 469 (1973), holding that a smile constituted an admission. If the jury concluded that the exculpatory words used by Scott were false, they could have regarded the statement itself as tending to show consciousness of guilt. *Wilson v. United States*, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090 (1896); *United States v. Sutherland*, 463 F.2d 641 (5th Cir.), *cert. denied*, 409 U.S. 1078, 93 S.Ct. 698, 34 L.Ed.2d 668 (1972); *United States v. Rajewski*, 526 F.2d 149 (7th Cir. 1975), *cert. denied*, 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 833 (1976); *United States v. Matousek*, 483 F.2d 286 (8th Cir. 1973). In *Rajewski* the court said, "It is well settled that untrue exculpatory statements may be considered as circumstantial evidence of the defendant's consciousness of guilt." 526 F.2d at 158.