**UNITED STATES of America,**

v.

**Ralph Tyrone WILLIAMS;
and Joseph Ellick.**

**No. CR 102–011.**

United States District Court,
S.D. Georgia,
Augusta Division.

May 7, 2003.

John Michael Faulkner, Augusta, GA, for United States.

Michael H. Bloom, Coconut Grove, FL, J. Larry Broyles, Augusta, GA, for Defendant Joseph Ellick.

James Pete Theodocion, Augusta, GA, for Defendant Ralph Tyrone Williams.

## ORDER

BOWEN, Chief Judge.

Presently before the Court are two motions filed by Defendant Joseph Ellick

("Ellick"): (1) a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure ("Rule") 29 (Doc. No. 128); and (2) a motion for new trial pursuant to Rule 33 (Doc. No. 128).[1] For reasons stated more fully below, the Court **GRANTS** Ellick's motion for judgment of acquittal and **DENIES** his motion for new trial.[2]

## I. PROCEDURAL HISTORY

On February 11, 2002, a grand jury returned a seven-count Indictment against co-defendants Tyrone Williams and Ellick. Ellick was charged in three counts of the Indictment Counts 1, 4, and 7. Count 7 was later severed from the Indictment and the United States of America ("the Government") submitted a redacted version of the Indictment for trial purposes. Count 7 remains unresolved. At the close of evidence at trial, Ellick moved for judgment of acquittal pursuant to Rule 29. The Court reserved decision on the motion and submitted the case to the jury.

On September 23, 2002, Ellick was convicted of Count 4 (Attempt to possess with intent to distribute cocaine (21 U.S.C. §§ 846 & 841)) and acquitted of Count 1 (Conspiracy to possess with intent to distribute and distribution of more than 50 grams of cocaine base (crack) (21 U.S.C. §§ 846 & 841)).

On October 8, 2002, Ellick filed a "Renewed Motion for Judgment of Acquittal and Motion for New Trial" (Doc. No. 128) arguing that "[t]he trial testimony of Special Agent Pat Clayton and Ernest Smith unequivocally indicates that the Defendant

did not commit any overt act in furtherance of the attempt." (*Id.* at 3.) As Ellick explained, "the Government's evidence clearly indicates that all Smith and the Defendant did was[ ] 'talk about a future drug rip off'[ ] that never even came close to fruition." (*Id.*) The Government responded to Ellick's motion on December 5, 2002 following receipt of the transcripts of certain witnesses' testimony. (Doc. No. 140.)

Ellick was sentenced on December 13, 2002, at which time he reiterated his motion for judgment of acquittal. During the sentencing hearing, Ellick was informed that he would have ten (10) days following the disposition of his pending Rule 29 motion to file his Notice of Appeal.

On December 17, 2002, the Court instructed Ellick and the Government to file a second brief describing the substantial step Ellick took in attempting to possess cocaine. (Doc. No. 146 at 5.) As the Court explained in its Order, nearly all the objective acts cited by the Government in its initial brief as constituting a substantial step occurred before the attempt was alleged to have begun on December 26, 1999. (*Id.* at 4.) On January 6, 2003, the Government complied with the Court's request (Doc. No. 152), and on February 4, 2003, Ellick filed his brief (Doc. No. 158).

## II. MOTION FOR JUDGMENT OF ACQUITTAL

### A. Background

1. *Factual Allegations of Count 4 and the Recruitment of Ernest Smith*

Count 4 alleges that between December 26, 1999 and August 8, 2000, Joseph Ellick

---

1. The motion Ellick filed on October 18, 2002 (Doc. No. 129) simply replicates the motion filed on October 8, 2002 (Doc. No. 128).

2. Rule 29 states that "[i]f the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine

whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed. The court must specify the reasons for that determination." Fed. R.Crim.P. 29(d)(1). As a result, the Court will also decide Ellick's motion for a new trial.

attempted to possess cocaine with the intent to distribute the same. The Indictment specifically alleges that Ellick attempted

> ██ meeting with E.S. [Ernest Smith] to plan, discuss, and coordinate how to take cocaine from a purported drug dealer by using [his] law enforcement authority ... [2] to subsequently provide E.S. with the purportedly seized cocaine for distribution ... [3] by telephonically coordinating the seizure, and by ... [4] instructing E.S. to call him when the purported drug dealer had arrived in Augusta so that the seizure could take place.

(Redacted Indictment at 3.)

The December 26 date in the Redacted Indictment corresponds closely to the commencement of a Government sting operation and the recruitment of a known drug dealer named Ernest Smith ("Smith"). In November 1999, the Government approached Smith about helping in a sting operation designed to apprehend Ellick attempting to procure drugs. (Smith Tr. at 139.) Although Smith could not recall the exact date, he testified that it was possible he wore a tape recording device for the first time on December 26, 1999, precisely the date the Indictment alleged the attempt crime to have begun. (*Id.* at 169.) After Smith began cooperating with the Government, he was given instructions to avoid engaging in any criminal conduct and to avoid attempting to set up a "drug bust" on his own. (*Id.* at 171.)

Smith eventually helped the Government make approximately 22 tape recordings comprised of both body recordings and recordings of telephone conversations. (*Id.* at 164.) Ten of those tapes were submitted into evidence against Ellick. (*Id.* at 164–65.) Of those ten tapes, one of them [3] was used primarily to elicit testimony from Smith about a purported rip off of a man named Junior Stokes [hereinafter the "Stokes Incident"] (Smith Tr. at 177; Govt. Exs. 25A, 25B), which was not planned, coordinated, or approved by the Government (Clayton Tr. at 61–62). The other nine tapes [4] primarily involved the Government-approved sting operation, but the Stokes incident was referenced on a few sections of these tapes. (*See* Smith Tr. at 177.) Many of the tapes contain both unintelligible portions [5] and segments that are difficult to understand without reference to Smith's testimony.

---

**3.** A body recording from January 20, 1999. (Govt. Exs. 25A (Recording), 25B (Transcript); *see also* Smith Tr. at 54, 59.)

**4.** The exhibit numbers of the Government tapes and transcripts of conversations between Smith and Ellick regarding the "sting operation" are as follows:
  1. Telephone recording from February 2, 2000: Exhibits 26A (Recording) and 26B (Transcript). (Smith Tr. at 67.)
  2. Body recording from February 2, 2000 at 5:06 p.m.: Exhibits 27A (Recording) and 27B (Transcript). (*Id.* at 69.)
  3. Body recording from April 26, 2000 at 7:20 p.m.: Exhibits 37A (Recording) and 37B (Transcript). (*Id.* at 73.)
  4. Body recording from May 17, 2000: Exhibits 38A (Recording) and 38B (Transcript). (*Id.* at 76.)
  5. Body recording from May 17, 2000 at 8:24 p.m.: Exhibits 39A (Recording) and 39B (Transcript). (*Id.* at 83.)
  6. Body recording from June 23, 2000 at 2:03 p.m.: Exhibits 40A (Recording) and 40B (Transcript). (*Id.* at 87.)
  7. Body recording from July 11, 2000 at 6:28 p.m.: Exhibits 41A (Recording) and 41B (Transcript). (*Id.* at 88.)
  8. Body recording from July 17, 2000 at 8:55 p.m.: Exhibits 42A (Recording) and 42B (Transcript). (*Id.* at 92.)
  9. Body recording from July 25, 2000 at 11:30 a.m.: Exhibits 43A (Recording) and 43B (*Id.* at 97.)

**5.** The unintelligible portions of the recordings are indicated with a "(UI)" in the transcripts.

### 2. *The Sting Operation*

The sting operation was directed, at least in part, at Ellick (Clayton Tr. at 72)[6] and was based on the purported existence of a drug dealer from Columbia, South Carolina (*Id.* at 64). The putative Columbia drug dealer was, in fact, a Drug Enforcement Administration ("DEA") agent. Smith's role in the sting operation was (1) to inform Ellick that he knew about a drug dealer from Columbia, South Carolina who was coming to Augusta, Georgia, and (2) to plan with Ellick for them to "rip off" the drug dealer's drugs so that Smith could resell them on the street and split the proceeds with Ellick. (Redacted Indictment at 3–4; Clayton Tr. at 70, 71.) The plan for the sting operation is essentially what was alleged in Count 4 of the Redacted Indictment. The evidence against Ellick concerning the attempt allegation came primarily from two sources: (1) the recordings of conversations between Ellick and Smith; and (2) Smith's testimony about the conversations contained on the recordings. The recordings submitted into evidence against Ellick concerning the sting operation were made on seven different dates of 2000: February 2, April 26, May 17, June 23, July 11, July 17, and July 25.

#### a. *Recordings of February 2, 2000*[7]

Smith and Ellick spoke twice on February 2, 2000–once by telephone (Govt.Ex.26A) and once face-to-face (Govt.Ex.27A). Smith testified that during the telephone conversation, he and Ellick discussed "setting up" drug dealers so that they could "rip off" their drugs. (Smith Tr. at 67–68.) At one point in the conversation, Smith commented "nice lick, nice lick, nice lick." (*Id.* at 67.) Smith testified

that he used this jargon to describe a potential drug dealer that he and Ellick might rip off. (*Id.* at 67–68.)

On February 2, 2000 at approximately 5:00 p.m., Ellick and Smith met. (Govt.Ex.27A.) Smith made a body recording of their conversation. (Smith Tr. at 69.) According to Smith's testimony, he informed Ellick about a drug dealer from Columbia, South Carolina. (*Id.*) Smith told Ellick that the drug dealer would be staying in a local motel and that the dealer's drugs would be in his motel room. (*Id.* at 70.) Smith stated that he told Ellick he could get the drug dealer out of the room. (*Id.* at 72.) Smith then testified that Ellick responded that if the drug dealer left his room, he would enter the room and wait for him. (*Id.*)

The Government concluded with the recordings of February 2, 2000 without providing any evidence that Ellick acted on any of the plans discussed in the recordings. Rather, the Government immediately proceeded at trial to introduce exhibits 37A and 37B, a recording and corresponding transcript from April 26, 2000.

#### b. *Recording of April 26, 2000*

Smith and Ellick had another recorded conversation on April 26, 2000 at approximately 7:20 p.m. (Govt. Ex. 37A; Smith Tr. at 73.) Smith testified that he informed Ellick that he was awaiting a call from the Columbia drug dealer (Smith Tr. at 74) and that he was considering asking him for a quarter kilo of cocaine (*id.* at 75–76), apparently with the idea of driving around with the drug dealer and planning an escape with the drugs. Smith testified that Ellick asked whether anyone would be in the car with the drug dealer when

---

6. Q [To Clayton from Bloom]. You were trying to set up the sting operation with Joe as a target, were you not?
   A. Yes.

7. The Government's recordings and transcripts from this date are exhibits 26A, 26B and 27A, 27B.

Smith was traveling with him. (*Id.* at 76.) Smith also testified that he and Ellick discussed Ellick's work schedule because Ellick wanted to be off work when the rip off occurred. (*Id.* at 74.) The Government concluded with the recording of April 26, 2000 without any further evidence that Ellick acted to stop the Columbia drug dealer or take his drugs.

### c. *Recordings of May 17, 2000*

Smith and Ellick spoke again on May 17. (Govt. Ex. 38A; Smith Tr. at 76.) Again, the conversation centered on the Columbia drug dealer. (Smith Tr. at 76–77.) In this discussion, Smith testified that he informed Ellick that the Columbia drug dealer was coming to Augusta and that they should attempt to rip him off. (*Id.* at 77.) Smith suggested one scheme in which he would ride with the dealer and jump out of the car with the dealer's drugs. (*Id.*) After making his escape from the vehicle, Ellick was to arrest Smith. He and Ellick could then keep the drugs to sell. (*Id.*) Smith further offered that an open container of beer in the car would give the stop the appearance of legitimacy. (*Id.* at 78.)

Smith testified that Ellick wanted to know the particulars of Smith's plan. For example, Ellick allegedly wanted to know what would happen in the event the drug dealer did not give chase to Smith, and what would happen if the drug dealer drove the car thereby preventing Smith from exiting the vehicle. (*Id.* at 79.) The Government did not submit any evidence that Ellick acted on Smith's proposals to pull over the drug dealer's vehicle and apprehend Smith.

Smith and Ellick had a second conversation on May 17 at approximately 8:24 p.m. (Govt. Ex. 39A; Smith Tr. at 83.) Smith

testified that Ellick considered using a Chevrolet Lumina, which was used by the police department for narcotics investigations, to pull over the Columbia drug dealer. (Smith Tr. at 84.) Smith claimed that Ellick worried about stopping the drug dealer in a predominantly white neighborhood where the crime suppression unit did not typically operate. (*Id.* at 85.) Smith testified that they discussed stopping the drug dealer's car, and the possibility of taking his drugs from a local motel room. (*Id.* at 85–86.) Again, the Government produced no evidence that Ellick actually made any effort to obtain the Chevrolet Lumina or that he gained access to the motel room of the dealer.

### d. *Recording of June 23, 2000*

Government exhibit 40A is a body recording of a conversation between Ellick and Smith which took place at approximately 2:03 p.m. (*See id.* at 87.) Smith gave little explanation of the events on this recording other than to say Ellick expressed concern about attempting a rip off around too many people.[8] (*Id.* at 88.) Smith stated that Ellick was concerned about having to explain his presence in the area of the rip off if other police were called. (*Id.*)

### e. *Recording of July 11, 2000*

Another conversation between Ellick and Smith took place at approximately 6:28 p.m. on July 11. Smith testified that he and Ellick again discussed attempting to rip off the Columbia drug dealer. (*Id.*) Smith testified that Ellick suggested the two of them precede the drug dealer to the hotel so they could rip him off when he arrived. (*Id.* at 89.) Smith testified that Ellick also suggested that Smith arrive

---

**8.** Smith did state that he and Ellick had ripped off Junior Stokes' money, an incident described within this Order.

early and get an idea of which car the dealer was driving and where he might be located in the motel. (*Id.*) Smith testified that Ellick wanted to have the make and model of the car so he could pull it over. (*Id.* at 89–90.) Smith also said that Ellick even suggested using his mother's car for surveillance. (*Id.* at 90.) The Government produced no evidence that Ellick ever obtained his mother's car, ever went to the motel, or ever stopped a person he believed to be a drug dealer from Columbia.

### f. *Recording of July 17, 2000*

The July 17 conversation between Ellick and Smith began at approximately 8:55 p.m. (*Id.* at 92.) The conversation ranged from one disjointed idea to another. For instance, Smith testified that Ellick discussed ripping off a large truck carrying drugs. (*Id.* at 93–94.) Smith also claimed that Ellick said that if someone were forced into a "trap," they might hide drugs in the bushes or under the house where he could simply take them. (*Id.* at 94.)

Smith again mentioned the Columbia drug dealer (*id.* at 95), and he testified that Ellick still wanted to pull off the "lick" (*id.*). However, Smith claimed that Ellick expressed concern about the drug dealer running and attracting attention. (*Id.*) Smith also testified that he suggested using his truck in a rip off and that he and Ellick discussed the possibility of Ellick arresting both Smith and the Columbia drug dealer, perhaps to give the appearance of propriety to the stop. (*Id.* at 96.)

The Government did not produce evidence that Ellick stopped any vehicles, that Ellick obtained any hidden drugs, or that he ever arrested Smith to help secure drugs.

### g. *Recording of July 25, 2000*

The recorded conversation of July 25 began at approximately 11:30 a.m. (Govt. Ex. 43A; Smith Tr. at 97.) This recording provided little other than Smith's testimony that other people were curious about why Ellick was associating with a known drug dealer. (Smith Tr. at 98.)

### 3. *The Stokes Incident*[9]

The Stokes incident involved the purported theft of money from a man named Junior Stokes in January 2000. (Smith Tr. at 167, 172.) This theft was not planned, coordinated or approved by the Government, but was, rather, wholly devised by Smith. (Clayton Tr. at 61–62.) As Smith explained, when he became a Government informant, he was told that he should report to Agent Clayton before attempting to do anything that would be considered criminal. (Smith Tr. at 171.) However, he did not inform Agent Clayton about any of the plans to steal Stokes' money. Consequently, the Government could neither present audio evidence of the alleged theft nor introduce any of Stokes' purportedly stolen money. Indeed, the Government's primary audio evidence is a relatively short section of a dialogue from a body recording of January 20, 2000. (Govt. Ex. 25A; Smith Tr. at 59.) On this tape, Smith and Ellick discussed Ellick "fixing" a ticket he had given Smith. (*See* Govt. Exs. 25A, 25B.) Ernest Smith used the explanation of the ticket to testify about the circumstances surrounding its issuance and, therefore, the Stokes incident. (Smith Tr. at 59–66.) The tape recording itself provides no corroboration of Smith's version of the Stokes incident.

Smith testified that he and Ellick planned to rip off Stokes. (*Id.* at 60.)

---

**9.** Ellick's attorney has referred to the circumstances allegedly leading to the theft of Junior Stokes' money as the "Stokes incident."

(Smith Tr. at 168, 171.) For the sake of consistency and clarity, the Court will use the same terminology.

According to Smith's testimony, Smith was to borrow $3,500 from Stokes. (*Id.*) Ellick was then supposed to pull Smith over so that the two could give the appearance of the money being confiscated by a law enforcement officer. (*Id.* at 60–61.) Smith would then tell Stokes that the police pulled him over, arrested him, and took his money. (*Id.* at 61.)

Smith testified that the plan was eventually put into action and that Stokes knew Smith had been stopped. (*Id.* at 61.) Smith testified that he was sure Stokes knew about the arrest because he called Stokes to ask him to pay his bond. (*Id.*) Smith further claimed that the stop was coordinated to take place in Stokes' neighborhood where Stokes might witness it. (*Id.* at 62.) Smith explained that by making sure Stokes knew he had been arrested, he could be sure that he would not have to repay the money. (*Id.*)

Finally, Smith testified that Ellick issued him at least one ticket.[10] It is the discussion of the ticket that is captured on the audio recording of January 20, 2000. (Govt.Ex.25A.) Smith stated that he asked Ellick whether he had fixed the tickets Ellick had given him (Smith. Tr. at 63), and that Ellick responded that he had forgotten (*id.*). Ellick later testified that he had no intention of fixing Smith's tickets. (Ellick Tr. at 39.)

On the audio recording, the word "flip" is used.[11] Smith claimed that Ellick was expressing that he wanted Smith to use the money taken from Stokes to purchase drugs. (Smith Tr. at 65.) However, much of Smith's testimony was contradicted by Ellick. For instance, Ellick stated that he never stopped Smith (Ellick Tr. at 39) and that he never arrested him (*id.* at 40). Ellick admitted, however, that he had given Smith a ticket. (*Id.*) Because Smith's actions were done without the Government's knowledge, the Government relies heavily on Smith's testimony. Without corroboration, Smith's testimony is a meager resource upon which to base a sentence of more than four years without parole.

## B. Standard Governing a Rule 29 Motion

■ Rule 29 states that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(c); *United States v. Jerez*, 935 F.2d 276 (Table), No. 89–50307, 1991 WL 101008, at *4 (9th Cir. June 12, 1991). "The applicable standard for ruling on a motion for judgment of acquittal is whether viewing the evidence presented most favorable to the Government, a reasonable-minded jury could accept the relevant and admissible evidence as (adequate) and sufficient to support the conclusion of defendant's guilt beyond a reasonable doubt." *United States v. Brown*, 587 F.2d 187, 190 (5th Cir.1979)

---

10. The testimony was unclear regarding how many tickets were issued. (*Compare* Govt. Ex. 25B at 1) ("Smith [speaking to Ellick]: Did you ever do anything on *the ticket* for me? I have to go to court.") (emphasis added), *with* Smith Tr. at 173 ("Q [from Michael Bloom]. Were you given two or three tickets by Joe Ellick on that date [January 9, 2000]? A. Yes.").

11. The transcript of the audio recording contains the following conversation containing the use of the verb "flip":

> Smith: You still want me, uh you still want me to do the other thing for you?
> Ellick: What?
> Smith: Bout what you say (UI)
> Ellick: Flip, to flip it?
> Smith: Yeah
> Ellick: Give me a minute though, in a minute
>
> (Govt. Ex. 25B at 5–6.)

(internal quotation marks omitted).[12] It is not the function of the Court to (1) assess the credibility of witnesses, (2) weigh the evidence, (3) resolve evidentiary conflicts, or (4) substitute its own judgment as to guilt or innocence for that of the jury. *Id.; Jerez,* 1991 WL 101008, at *4.

## C. Analysis

### 1. *The Elements of an Attempt*

■ The Eleventh Circuit set forth the elements of an "attempt" crime in *United States v. McDowell,* 705 F.2d 426 (11th Cir.1983):

First, the defendant must have been acting with the kind of culpability otherwise required for the commission of the crime which he is charged with attempting.... Second, the defendant must have engaged in *conduct which constitutes a substantial step* toward commission of the crime. A substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent.

*McDowell,* 705 F.2d at 427–28 (quoting *United States v. Mandujano,* 499 F.2d 370, 376 (5th Cir.1974)) (citations omitted) (emphasis added).

■ In defining the type of conduct that may constitute a "substantial step," the Eleventh Circuit has explained that "the court must find that the defendant's *objective acts,* without reliance on the accompanying *mens rea,* mark the defendant's conduct as criminal. In other words, the defendant's acts, taken as a whole, must strongly corroborate the required culpability; they must not be equivocal." *United States v. McDowell,* 705 F.2d 426, 428 (11th Cir.1983) (citing *United States v. Oviedo,* 525 F.2d 881 (5th Cir.1976)) (emphasis added); *see also United States v. Carothers,* 121 F.3d 659, 661 (11th Cir.1997). To avoid convicting a person of an attempt improperly, "[t]he acts should be unique rather than so commonplace that they are engaged in by persons not in violation of the law." *Oviedo,* 525 F.2d at 885.

### 2. *The Objective Acts Cited by the Government*

The Government cites several actions it asserts supply the substantial step necessary to support Ellick's conviction: (1) Ellick's prior drug transactions with Smith (Doc. No. 152 at 6–7); (2) Ellick's statements to Smith and their meetings in planning and coordinating the seizure of cocaine (*id.* at 1–6); and (3) Ellick's provision of money to Smith with instructions to "flip it" to purchase drugs (*id.* at 4–6).

#### a. *Ellick's Transactions Prior to December 26, 1999*

■ The Government contends that the alleged drug transactions that occurred *before 1999,* and thus *before the attempt crime was alleged to have begun,* constitute a substantial step toward the commission of the attempt crime. (*Id.* at 6.) The Government's evidence shows that the prior drug transactions between Smith and Ellick fell before December 26, 1999.[13]

---

12. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions that were handed down prior to the close of business on September 30, 1981.

13. Upon review of Smith's testimony, the Court found the following pertinent discussion of the time-frame for at least one of the drug transactions that occurred at Butler High School:

Q [from Michael Bloom]. Let me talk about the period before 1999 first of all. In your direct testimony you related an incident that took place at Butler High School; do you recall that?
A. Yes.
Q. I want you to give the jury the time and date that this incident at Butler High

Thus, these alleged drug transactions fell before the attempt even began.

The Government relies exclusively on *United States v. McDowell*, 705 F.2d 426 (11th Cir.1983), for the proposition that drug transactions occurring before a crime begins can constitute a substantial step of the indicted attempt. (Doc. No. 152 at 6.) The Government quotes the portion of *McDowell* stating that "McDowell's objective acts include ... a prior drug transaction with [the undercover informant]." *McDowell*, 705 F.2d at 428. The Government points out that the prior drug transaction in *McDowell* occurred in the fall of 1980 though McDowell was not arrested until the Spring of 1981 when he tried to purchase more drugs from the informant. (Doc. No. 152 at 6.)

The Court finds *McDowell* unpersuasive. First, despite the fact that the prior drug transaction was listed among the objective acts, the court did not address the instant question of whether an objective act occurring before a criminal attempt begins may satisfy the substantial-step element of that attempt. In fact, the court's discussion of the prior drug transaction focused on whether the evidence was (1) inextricably intertwined material or (2) extrinsic act evidence demonstrating intent.

> McDowell argues that the evidence of his first cocaine deal with Dalmau was inadmissible under Fed.R.Evid. 404(b).... An act cannot be characterized as an extrinsic act when the evidence concerning that act and the evidence used to prove the crime charged

are inextricably intertwined. *Arguably evidence concerning the dealings between Dalmau and McDowell is "inextricably intertwined" with the crime charged.* Dalmau's testimony might have been incomplete and confusing had he not been permitted to mention the first cocaine deal. Even if the first transaction is treated as an extrinsic act, admission of the evidence was proper under the test set out in *U.S. v. Beechum*, 582 F.2d 898, 911 (5th Cir.1978) (en banc). *Beechum* held that extrinsic act evidence is admissible if the evidence is relevant to an issue other than the defendant's character, Fed.R.Evid. 404(b), and if the probative value of the evidence is not substantially outweighed by its prejudicial effect. Fed.R.Evid. 403. *In the case before us evidence of the prior cocaine deal was admissible to show intent.* The district court did not abuse its discretion in ruling that the prejudicial effect of the evidence did not substantially outweigh its probative value.

*Id.* at 428–29 (emphasis added) (citations and footnote omitted).

It is illogical that a substantial step towards the commission of a crime can occur before the alleged crime even begins. In this case, the attempt is alleged to have begun on December 26, 1999. Thus, the drug transactions allegedly occurring before December 26, 1999 cannot provide the essential substantial-step element of the attempt.[14]

---

School, that I will call Butler number one, occurred?

.        .        .        .        .

A. It could have been the last of '97 or on into '98.

(Smith Tr. at 158, 161.) The Government's evidence demonstrates that all of the drug transactions the Government cites as objective acts constituting a substantial step occurred before December 26, 1999.

**14.** The Court also notes that the drug transactions purportedly occurring before December 26, 1999 have little to do with the facts alleged in Count 4. The facts in Count 4 are based on the circumstances of the sting operation while the drug transactions occurring before December 1999 are directly related to Count 1 of which Ellick was acquitted.

#### b. Ellick's Contact with Ernest Smith

■ The Government asserts that Ellick's planning meetings and verbal statements, which are captured on audio recordings and discussed in Smith's testimony, were objective acts sufficient to constitute a substantial step. (Doc. No. 152 at 4.) The issue squarely presented by the Government's assertion is whether Ellick's discussions and meetings with Smith constitute a substantial step or whether they are "mere preparation" insufficient to support a conviction for attempt. *See United States v. Mandujano*, 499 F.2d 370, 377 (5th Cir.1974) ("The requirement that the conduct be strongly corroborative of the firmness of the defendant's criminal intent also relates to the requirement that the conduct be more than 'mere preparation'....").

Although planning meetings and verbal statements may constitute a substantial step, *see United States v. Brown*, 604 F.2d 347 (5th Cir.1979), they must, at a minimum, evidence a firm agreement. *Brown*, 604 F.2d at 350. Ellick and Smith's contacts fail to establish a "firm agreement" to commit a crime.

Ellick's discussions with Smith demonstrate a far different set of circumstances than those present in *Brown*. First, Ellick and Smith discussed not one, but several ideas for ripping off drug dealers without choosing and focusing on any one in particular. (*Compare, e.g.,* Govt. Exs. 27A, 27B, *with* Govt. Exs. 37A, 37B.) They discussed various scenarios for luring the drug dealer out of a motel as well as various ways of Ellick stopping the drug dealer's vehicle.

Ellick and Smith never committed to any particular plan. The February 2, 2000 recording contains dialogue of Ellick and Smith discussing a potential rip off of a drug dealer in a hotel room. (Govt.Ex.27A.) Yet, the very next recording in the chronological sequence (Govt.Ex.37A), a tape made over 2½ months later on April 26, contains Ellick and Smith's idea of stopping the drug dealer's vehicle. On the next recording of May 17 at 2:17 p.m. (Govt.Ex.38A), Ellick and Smith again discuss a variation of a vehicle stop (Smith Tr. at 77), only to return to contemplating a motel rip off later the same day at 8:24 p.m. (Govt. Ex. 39A; Smith Tr. at 85–86). Approximately two months later, on July 11, 2000, the pair discussed both a potential motel rip off (Govt. Ex. 41A; Smith Tr. at 89) and a potential vehicle stop (Govt. Ex. 41A; Smith Tr. at 89–90) in the same conversation, but then once again shifted their focus to a variation of a vehicle stop on the July 17, 2000 recording, the penultimate tape in the series. (Govt. Ex. 42A; Smith Tr. at 96–97.) The July 17 recording is the last one with any detailed discussion of a potential rip off, and, not surprisingly, gives no real indication of whether Smith and Ellick ever finally decided on any particular method of conducting a rip off.

The recordings leave little doubt that Ellick and Smith did not come to any agreement or conclusion about how to steal the drugs from the purported drug dealer. It would require more mental gymnastics than I can muster to interpret the evidence as showing that Ellick took a substantial step towards the commission of a crime when it clearly demonstrates that the two never even arrived at a plan for conducting the rip off of a vaguely identified target. Ellick's participation in the planning discussions with Smith fail to sufficiently confirm that he had a firm agreement with Smith to commit the crime.[15]

---

15. The Government asserts that Smith rode around with Ellick pointing out drug dealers to rip off, and that these actions constitute a substantial step. (Doc. No. 152 at 5–6.) However, the testimony cited by the Government does not support finding that these "rides" occurred during the period from December 26, 1999 to August 8, 2000. The

Rather the discussions and planning meetings with Smith constitute mere preparation insufficient to constitute a substantial step.

### c. The Stokes Incident

■ The Government also argues that Ellick gave money to Smith to purchase drugs and that this constitutes the substantial-step element of the Count 4 attempt. However, the Stokes Incident and Ellick's action in it cannot form the basis for the substantial step of Count 4. Count 4 of the Indictment specifically informed Ellick of the substantial step the Government sought to prove in court and, thus, what action Ellick was accused of committing. Count 4 states that Ellick

performed[ed] a *substantial step* ... by meeting with E.S. [Smith] to plan, discuss, and coordinate *how to take cocaine* from a *purported drug dealer* by using [his] law enforcement authority ... to subsequently *provide E.S. [Smith] with the purportedly seized cocaine*, by telephonically coordinating the seizure ... and ... instructing E.S. [Smith] to call him when the purported drug dealer had arrived in Augusta so that the seizure could take place.

(Redacted Indictment at 3.) Despite the fact that the Indictment set forth by the grand jury specifically enumerated the substantial step, the Government is attempting to use a different objective act from a different set of facts to satisfy the substantial-step element of Count 4.

The Stokes Incident does not involve (1) a third-party drug dealer, (2) the theft of drugs, or (3) the provision of drugs from Ellick to Smith. In essence, Count 4 involved a narcotics transaction. Yet Agent Clayton testified that the Stokes Incident was not a drug transaction and that the DEA would not have used this type of transaction in their sting operation for that reason. (Clayton Tr. at 62.)

Law binding on this Court has recognized that "if an indictment enumerates the *particular facts* alleged to constitute the element of a charged crime and the proof makes out the elements in a different manner, a *fatal variance* results." *United States v. Guthartz*, 573 F.2d 225, 228 (5th Cir.1978). A fatal variance is one in which this Court "is obliged to render a verdict of acquittal on the ground that the evidence is insufficient to sustain conviction." *United States v. Eaton*, 501 F.2d 77, 80 (5th Cir.1974). The Indictment spe-

---

testimony cited by the Government is as follows:

Q [By Michael Bloom]. Give the jury the number of arrests that you or other members of the S team were able to make based on information that was provided to you by Ernest Smith?
A. From '99 to 2000, misdemeanors as far as the whole team is concerned I'd say 80 to 100.

(Ellick Tr. at 16.) The Government further cited the following information:

Q [By Michael Bloom]. Did you use the same story line with Ernest Smith from February to July that you had used to get him to give you information in the past?
A. I used [it] from '98 all the way up to 2000.

(*Id.* at 28.) As an initial matter, Ellick's testimony does not indicate when his "rides" with Smith terminated. The testimony concerns the relevant times that a particular "story line" was used and the number of arrests that were made by law enforcement officers. Further, the time period discussed in the testimony ended at the end of 1999 and did not continue into 2000. Yet, the relevant actions of Count 4 occurred almost exclusively in 2000, and the first audio recording submitted into evidence against Ellick is from January 20, 2000. (Govt.Ex.25A.) The testimony cited by the Government does not, therefore, support a finding that the "rides" described by Ellick took place during the relevant time period of Count 4 encompassing the dates of December 26, 1999 up to and including August 8, 2000.

cifically sets forth a markedly different set of objective acts constituting the substantial step than that the Government is now attempting to use. Thus, the Stokes Incident cannot provide the action that satisfies the substantial-step element of the attempt count.

### 3. *Result*

The Government has failed to show that Ellick committed any objective act sufficient to constitute a substantial step. The audio and testimonial evidence provided by the Government establishes only that Ellick engaged in "mere preparation" insufficient to satisfy the substantial-step element of Count 4. As a result, and pursuant to Rule 29, the evidence is insufficient to support the conviction for attempt and Ellick's motion for judgment of acquittal is **GRANTED.**

## III. *MOTION FOR NEW TRIAL*

### A. Background of the Maxwell Scenario[16]

■ Ellick's motion for a new trial stems from an incident that occurred on or near May 12, 2000. (Doc. No. 107 ¶ 3.) On that date, Rodricgus Maxwell ("Maxwell") was stopped by law enforcement officers for a traffic violation. (*Id.* ¶ 3.) Specifically, Ellick, who was then a law enforcement officer with the Richmond County Sheriff's Department, was advised by another officer to make the initial stop of Maxwell's car. (*Id.* ¶ 6.) After Maxwell's vehicle was stopped, a search of the car revealed that it contained crack cocaine, which was seized by the officers. (*Id.*) Criminal charges were then filed against Maxwell. (*Id.*) Both the seizure and prosecution appear regular and legitimate. The gravamen lies in other actions.

Maxwell asserted in state court that the seizure of drugs from his vehicle was in violation of the Fourth Amendment. (*Id.* ¶ 5.) As a result, Maxwell intended to file a motion to suppress the seized drug evidence. (*Id.* ¶ 7.) By the time the motion to suppress was scheduled to be heard in state court, Ellick no longer worked for the Richmond County Sheriff's Department and had moved to Fort Lauderdale, Florida. (*Id.* ¶ 9.) Because Ellick was one of the officers involved in the initial stop, Maxwell's attorney believed that Ellick's testimony would corroborate that of Maxwell and, thus, help his case. (Doc. No. 128 at 6.) However, when Maxwell's lawyer decided to use Ellick's testimony, less than a week remained before the hearing. The attorney testified during Ellick's trial that he could not subpoena Ellick in time to have him appear at the hearing because Ellick lived in Fort Lauderdale. As a result, Maxwell began communicating with Ellick through an intermediary named Mareo Clarke ("Clarke") and offered to pay Ellick's expenses if he would return to Georgia to testify.

According to the Government, Ellick demanded $3,000 to testify at Maxwell's trial in addition to the cost of an airline ticket and motel room. (Doc. No. 140 at 9 (citing Maxwell Test. at 28–29).)[17] Ellick, in contrast, claimed that Clarke was the one actually making the demands for $3,000. (*Id.*) Ellick came to Augusta, but never testified because Maxwell accepted a deal involving a plea of guilty and twenty years probation. (Doc. No. 107 ¶ 10.)

At Ellick's trial in this Court, the Government sought to introduce evidence that Ellick was taking advantage of his law

---

16. The parties have referenced the facts involved in Ellick's motion for a new trial as the "Maxwell scenario." Thus, this Court will utilize this terminology.

17. The Court does not have a transcript of Maxwell's testimony.

enforcement position to accept bribes to testify about perjured facts. (*Id.* ¶ 11.)

## B. Federal Rule of Evidence 404(b)

The Government contends that the evidence involving the Maxwell scenario is admissible under Federal Rule of Evidence ("Rule") 404(b). (Doc. No. 140 at 10.) [18] Rule 404 provides that evidence of other crimes, wrongs, or acts is admissible for several limited purposes, including proving motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Fed.R.Evid. 404(b). The Eleventh Circuit has set forth the following three-part inquiry to govern the admissibility of Rule 404(b) evidence:

First, the evidence must be relevant to an issue other than the defendant's character; Second, the act must be established by sufficient proof to permit a jury finding that the defendant committed the extrinsic act; Third, the probative value of the evidence must not be substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of Rule 403.

*United States v. Lampley,* 68 F.3d 1296, 1299 (11th Cir.1995) (quoting *United States v. Delgado,* 56 F.3d 1357, 1365 (11th Cir.1995)). If these three prongs are satisfied, the Government's use of evidence from the Maxwell scenario was proper.

### 1. *The Evidence is Relevant to an Issue Other than Ellick's Character*

The Government argues that the extrinsic act evidence is relevant to Ellick's intent. (Doc. No. 140 at 11.) The Eleventh Circuit has stated that "[a] defendant who enters a not guilty plea makes intent a material issue which imposes a substantial burden on the government to prove intent, which it may prove by qualifying Rule 404(b) evidence absent affirmative steps by the defendant to remove intent as an issue." *United States v. Zapata,* 139 F.3d 1355, 1358 (11th Cir.1998) (per curiam). Because Ellick entered a plea of not guilty, he has made the intent element of the crime a material issue in this case.

The Government further contends that "[t]he gravamen of [Ellick's] crimes was that [he] would use his authority as a deputy sheriff to make money for himself and his partners ... by illegally preying on drug dealers." (Doc. No. 140 at 7.) Therefore, "dealing with the extortion of cash in exchange for testimony was admissible to show Ellick's continuing intent to prey on drug dealers." (*Id.* at 10.)

The Court of Appeals has held that the "[s]imilarity of the extrinsic acts to the offenses ... charged is the standard by which relevancy is measured under rule 404(b)." *United States v. Williams,* 816 F.2d 1527, 1531 (11th Cir.1987). The *Williams* court further specified that "[t]he extrinsic acts must be similar enough [to the charged crime] ... to be probative of [the defendant's] intent." *Id.;* *see id.* (finding that rape and assault, though seemingly unrelated, were similar because of the specific facts of the defendant's actions). Probing the facts of Ellick's attempt crime and the alleged extrinsic act of accepting a bribe reveals many similarities. First, whether Ellick was stopping drug dealers in their cars to steal their drugs or trading his testimony about his involvement in a drug seizure for money, Ellick's intent was to utilize his law enforcement position to financially benefit himself. Second, Ellick took advantage or attempted to take advantage of a drug dealer in both the indicted crime and the

---

**18.** The Government also asserted that the Maxwell-scenario evidence was inextricably intertwined with the evidence of the alleged crime and that it is admissible on that basis.

The Court need not address this argument since it finds the evidence admissible under Rule 404(b). (Doc. No. 140 at 10.)

alleged extrinsic act. Finally, in both Ellick's crime and his extrinsic act, Ellick utilized a third party, perhaps as a method of insulating himself from detection by law enforcement.

Perceived broadly, the Government is attempting to depict a law enforcement officer who unfairly and illegally capitalizes financially from his position. The extrinsic actions and the indicted actions are not identical, but they need not be. Ellick's extrinsic act is similar enough to his crime to be probative of his intent.

### 2. A Jury Could Find that Ellick Committed the Extrinsic Act

The Government can introduce otherwise admissible extrinsic evidence "if the jury could find by a preponderance of the evidence that the acts did in fact occur." *United States v. Bowe,* 221 F.3d 1183, 1192 (11th Cir.2000) (citing *Huddleston v. United States,* 485 U.S. 681, 689, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)). Stated differently, the second prong "requires a finding that the jury *could* find that the defendant committed the offense." *United States v. Shores,* 966 F.2d 1383, 1386 (11th Cir.1992) (italics in original). The jury could find by a preponderance of the evidence that the extrinsic act occurred. Elif Hogan ("Hogan"), the girlfriend of Maxwell, testified that she provided nearly $2,500 to Ellick just before his appearance as a witness last fall. (Hogan Tr. at 6.) She testified that she "overnighted" $1,500 to Ellick and that Maxwell gave Clark and Ellick $1,000 on the day he arrived. (*Id.*) Further, Hogan stated that she paid for Ellick's flight, which was approximately $550, and provided him with a hotel room, which was approximately $100. (*Id.*) Hogan's testimony closely corresponds with that of Maxwell who indicated that Ellick was demanding $3,000 to testify and that the money should be given to Clarke who would then give it to Ellick. (Doc. No. 140 at 9 (citing Maxwell Test. at 28–29).)

While it is possible that Clarke contrived the demand for $3,000 without Ellick's knowledge (*see* Hogan Tr. at 14), sufficient evidence exists to find that Ellick accepted money in return for his testimony.

### 3. The Probative Value of the Evidence Outweighs the Prejudicial Effect and the Evidence Meets the Requirements of Rule 403

The third prong of the test for admissibility of evidence under Rule 404(b) requires the Court to find that (1) the probative value of the evidence outweighs the prejudicial effect and that (2) the evidence otherwise meets the requirements of Rule 403. "The rule in this circuit is that extrinsic evidence of similar acts will possess great probative value if the defendant's intent is in issue and if the government lacks other strong evidence of defendant's intent." *Williams,* 816 F.2d at 1532. As the Court has stated, the Government bore the substantial burden of proving criminal intent when Ellick pleaded not guilty to the various counts in the Indictment. In addition, the Government's case against Ellick regarding Count 4 relies extensively on the testimony of Smith, a known drug dealer. Even the audio tapes submitted into evidence rely heavily on Smith for an explanation. As a result, the probative value of the evidence is significant.

The Eleventh Circuit has explained that all evidence is inherently prejudicial to a defendant. Thus, "[o]nly 'unfair' prejudice is prohibited by Federal Rule of Evidence 403." *Id.* The Court of Appeals has determined that "determining prejudice to outweigh probativeness under rule 403 is an exceptional remedy." *Id.*

The standard for determining unfair prejudice begins with an assessment of the nature of the extrinsic act. If the extrinsic offenses are so heinous "that they are likely to sway the jury irrevocably to a

decision of guilt, then they must be excluded under rule 403." *Id.* The act of accepting a bribe is not a heinous act that would automatically lead to a decision of guilt.

Because Ellick's act is not heinous, the Court must make a "commonsense assessment of all the circumstances surrounding the extrinsic offense." *United States v. Dothard,* 666 F.2d 498, 502–03 (11th Cir. 1982) (internal quotation marks omitted). The Government is trying to show that Ellick took unfair advantage of his position to profit. Ellick allegedly used his law enforcement powers to stop Maxwell's vehicle and then traded his testimony about the stop for money. Similarly, Ellick was indicted for attempting to use his law enforcement powers to stop a drug dealer for the purpose of taking his drugs for sale and profit. Ellick's actions in both situations require a mind set of an officer who utilizes his position for financial gain. The circumstances of the extrinsic act are such that it is not unfair for the Government to have submitted the evidence of the Maxwell scenario to the jury for its consideration.

## C. Result

Federal Rule of Criminal Procedure 33 provides that a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R.Crim.P. 33(a). Because the evidence of the extrinsic act involved in the Maxwell scenario was properly admitted pursuant to Federal Rule of Evidence 404(b), the interest of justice does not require this Court to permit a new trial.[19] As a result, Ellick's motion is **DENIED.** (Doc. No. 128.)

## IV. *CONCLUSION*

For the aforementioned reasons, Ellick's Rule 29 motion for judgment of acquittal on Count 4 is **GRANTED.** Ellick is **ACQUITTED** of and **HEREBY DISCHARGED** on the charges brought against him in this case under Counts 1 and 4 of the Indictment. His Rule 33 motion for a new trial is **DENIED.** (Doc. No. 128.)

---

**19.** Ellick makes one other argument at the close of his brief that merits notice. He argues that the Court erroneously permitted some hearsay statements concerning (1) Clarke's demand that Maxwell pay $3,000 and (2) the subsequent payment of that amount to Clarke, purportedly on behalf of Ellick. (Doc. No. 128 at 7–8.) Ellick admits that a limiting instruction was given in regard to the testimony, but nonetheless argues that

"the jury ... [was] not [] able to distinguish between the substantive evidence in this case, i.e. the payment of $900.00 to Ellick and Clarke's hearsay evidence, i.e. payment of $3,000 to Clarke on behalf of Ellick." (*Id.* at 7.) Of course, Ellick can only assume and speculate that the jury failed to follow the Court's instruction. Such speculation does not merit a new trial.